ceiving the Confederate and Georgia treasury notes from Hill, he turned them over to Daniells, who then delivered him the note, and he handed it to Hill; but he does not recollect whether the note had been sequestrated and confiscated or not. Hill says he attached the note to the plaintiffs' interrogatories, and has not seen it since.

Upon a careful perusal of the evidence, I do not think it sustains the position of the defendant, that the plaintiffs had their domicile or fixed residence in Georgia, on the 8th of January, 1860, when they placed the note with the attorneys for collection. But, assuming that it was then their actual residence, still, notwithstanding such fact, no presumption arises as to these plaintiffs (though the contrary was urged), that they continued to dwell here, on the 24th of December, 1863, when Hill got possession of the note, or during any period of the Civil War. It is true that the supreme court declares, in Mitchell v. U. S., 21 Wall. [88 U. S.] 350, that "a domicile once acquired is presumed to continue until it is shown to have been changed." But it seems to me that it would be illogical, if not, indeed, a pernicious straining of the general doctrine of inhabitancy, to infer and determine that these plaintiffs continued to reside here after the war commenced,—a conclusion which, in judgment of law, would impress them with a hostile character to the United States, whether they were adherent to the Rebellion or not.

Again, suppose that they really were residents of this state when they gave the note to the attorneys for collection, and that from the commencement to the termination of the war they resided here or elsewhere within the limits of the Confederate territory, and without conferring any authority upon the attorneys to take, or having any knowledge, indeed, that they had taken payment for it in Confederate States treasury notes and state of Georgia treasury notes,—currencies not in existence until two years subsequent to the date of the note,—and when received at par for it, the relative value of the Confederate States paper, never made a legal tender by their congress, was as twenty, and the state of Georgia paper, which state, at no time, passed any law to compel creditors to receive it, or any in regard to it, that would otherwise impair the obligation of contracts, as fifteen to one of gold, it clearly seems to me that the acceptance of these currencies by the attorneys, under such a state of facts, would not discharge Hill from liability on his note. Be that as it may, the testimony discloses that the note was made on the 16th of February, 1859, and matured on the first of January, 1860; and it is not questioned that the plaintiffs took it for value, and while under due. The term "dollars," as employed in this instrument, means dollars of the lawful money of the United States; and as it was not only executed, but came to maturity before the civil strife began, no extraneous evidence will be permitted to give it a different signification.

No evidence has been adduced to show that the plaintiffs knew of the pretended payment of the note, or of its delivery to Hill until immediately before the institution of this suit, therefore no negligence is imputable to them. Then it is useless to pursue this subject further than to quote the language of the supreme court, by Mr. Justice Field, in Ward v. Smith, 7 Wall. [74 U. S.] 447: "The power of a collecting agent, by the general law, is limited to receiving for the debt of his principal that which the law declares to be a legal tender, or which is, by common consent, considered and treated as money, and passes as such at par, is established by all the authorities. The only condition they impose upon the principal, if anything else is received by his agent, is, that he shall inform the debtor that he refuses to sanction the unauthorized transaction, within a reasonable period after it is brought to his knowledge."

There must be a decree for the plaintiffs, with interest at the rate of seven per cent. per annum on the principal from the first of January, 1860, to the 19th of April, 1861, when the interest shall cease, and commence again on the second of August, 1866, and run to the present time, with costs of suit. See U. S. v. Muhlenbrink [Case No. 15,831].

## Case No. 13,502.

### STOUGHTON v. TAYLOR.

[See Case No. 7,558.]

## Case No. 13,503.

### STOUT v. SIOUX CITY & P. R. CO.

[11 Am. Law Reg. (N. S.) 226; 6 Am. Law Rev. 759.]

Circuit Court. D. Nebraska. 1872.

NEGLIGENCE DEFINED—DANGEROUS MACHINERY—INJURY TO YOUNG CHILD—CONTRIBUTORY NEGLIGENCE OF FATHER—RAILROAD TURNTABLES.

[1. Negligence may be defined to be doing some lawful act in a careless, unusual, and improper way, or omitting the performance of some act required by law to be done, by which injury results to the person or property of another.]

[2. Negligence of a father in permitting his young and inexperienced child to wander from home, and go upon a dangerous piece of machinery, will not prevent liability of the owner of the machinery for an injury to the child, resulting from such owner's carelessness and negligence in not properly guarding and securing the same.]

3. If a railroad company keeps and uses its turntable as prudent and well-managed railroad companies in other places are in the habit of doing, and it is not the habit of such companies to keep them locked, so that they cannot be turned by children, or others, such company is not liable for a personal injury resulting to a young child, playing about the turntable, by reason of its failure to keep the same guarded or locked, so that it could not be turned by children.]

This was an action brought to recover the sum of $15,000 damages resulting to the plaintiff [Harry G. Stout], a minor child